IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE: FAMILY OF CARE REAL ESTATE HOLDING CO., INC. and CHARLES COUNTY NURSING AND REHABILITATION CENTER :

FAMILY OF CARE REAL ESTATE HOLDING CO., INC., et al. :

Appellants :

v. : Civil Action No. DKC 26-2026

CHAPMAN PROPERTY LLC, :

Appellee :

**MEMORANDUM OPINION**

Appellants Family of Care Real Estate Holding Co., Inc. and Charles County Nursing and Rehabilitation Center, Inc. ("Appellants"), debtors in the underlying bankruptcy case, appeal from the order of Bankruptcy Judge Lori S. Simpson overruling in part Appellants' claim objection and finding that Appellee Chapman Property LLC ("Chapman") is entitled to rejection damages. (ECF No. 1). Chapman has filed a motion to seal an exhibit. (ECF No. 16). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the order of the bankruptcy court will be affirmed and the motion to seal granted.

# I. Relevant Background[1]

## A. Factual Background

This appeal centers around a contract—the asset purchase agreement ("APA")—formed between Appellants and Chapman on September 12, 2022. (ECF No. 3-58 ¶ 8). The APA provided for the sale of a skilled nursing facility ("SNF") and ancillary items from Appellants to Chapman for a price of $28,200,000. (*Id.*). The deadline for closing the sale was set initially for November 26, 2022, but Chapman could exercise two thirty-day extensions with the payment of a deposit. (ECF No. 3-31, at 6–7).

Execution of the APA did not proceed smoothly. In November 2022, the parties amended the APA to delay closing to December 1, 2022. (ECF No. 3-58 ¶ 8). Chapman then exercised its two extension

[1] The following facts are derived from the record in this case. (ECF No. 3; ECF No. 4). Appellants filed an appendix with additional exhibits on July 27, 2026. (ECF No. 11-1). Appellants' appendix contains two highly relevant exhibits that the Bankruptcy Court received in evidence at the multi-day hearing held from October 22 to November 6, 2025, which appear to have been mistakenly omitted from the initial record on appeal. First is a January 11, 2023, email sent by Uri Kanahow, (ECF No. 11-1, at 80–82 ("January 11 Email")), entered into evidence without objection as Debtors' Exhibit 8 on October 22, 2023. (*See* ECF No. 3-61, at 253). Second is a January 17, 2023 letter from Catherine Hopkin, (ECF No. 11-1, at 87–92 ("Second Hopkin Letter")), entered into evidence without objection as Debtors' Exhibit 10 on October 23, 2023. (*See* ECF No. 3-59, at 19). Because they are central to the appeal and their authenticity is not disputed, these exhibits will be considered as part of the record.

options, pushing the scheduled closing date to February 1, 2023. (*Id.* ¶ 9).

Around January 2023, Uri Kahanow, an executive of Chapman's parent company Tryko,[2] began communicating with Appellants' Chief Executive Officer Andrea Dwyer about rising costs associated with the purchase of the SNF. (ECF No. 3-65, at 31–41). Mr. Kahanow requested a discount in price to cover the increased expenses. (*Id.* at 33–34). Ms. Dwyer asked Mr. Kahanow to send her an email detailing Chapman's request, which she would present to the board of directors ("Board") of Appellants' parent organization.[3] (*Id.* at 41). On January 11, 2023, Mr. Kahanow sent Ms. Dwyer an email explaining that:

> [a]s discussed we heard back from our bank today that they're [sic] committee is prepared to move forward with the loan. It comes along with thresholds, escrows, and SWAP requirements that are workable but do impact the numbers. This combined with the impact of the numbers outlined below which combined have a total negative impact of more than $4MM over a 5 year period to our bottom line. Internally we do not plan on being profitable year 1 but we cannot absorb significant losses. We would need a $1.5MM adjustment in the purchase price

[2] The Bankruptcy Court treated Mr. Kahanow's communications as "attributable to Chapman," and that conclusion is not challenged by the parties. (*See* ECF No. 1-1, at 14).

[3] The parent organization is Family of Care Alliance a/k/a Sagepoint Senior Living Services ("FOCA"). (ECF No. 3-58 ¶ 1). It appears that FOCA had authority over Appellants in this matter.

> to move forward and cushion some of the impact.
>
> If this is acceptable the only two outstanding items would be the condo docs which Joe has two outside attorneys working on and the timing which we are waiting on confirmation if the bank will have everything they need to close by Feb 1st or if they will need to push the closing off for 2 weeks. We understand this hasn't always been as smooth as anticipated and we hope you could appreciate that we are in a very challenging capital market[] for turnaround opportunities with more then [sic] half of the traditional healthcare banks not lending at all. The good news is we believe we have most of the stresses behind us. We appreciate the consideration and look forward to hearing back.

(ECF No. 11-1, at 80).

Later that day, Appellants' attorney Ms. Hopkin sent a letter to Chapman's in-house counsel characterizing the January 11 Email as follows:

> It has come to my attention that Uri Ukahanow [sic] confirmed in writing today his communication to Andrea Dwyer, that Chapman Property LLC (the "Purchaser") has not (and will not be able to) timely secure funding necessary to enable it to pay the full purchase price of $28,200,000.00 (the "Purchase Price") for the purchase of the Property. As you know, Purchaser is obligated to pay the Purchase Price at a closing of the sale of the Property on February 1, 2023, pursuant to the Asset Purchase Agreement dated September 12, 2022 (the "APA"), and there is no financing contingency with respect to Purchaser's obligations. Mr. Ukahanow [sic] has stated that Purchaser will not close as required on February 1, 2023, unless its

> request for a price adjustment of $1,500,000 is accepted by Seller.[4]

(ECF No. 3-56, at 112 ("First Hopkin Letter"). The letter explained that "[a]ny such agreement to a Purchase Price adjustment is solely Seller's decision." (*Id.*).

The First Hopkin Letter then requested that

> if Purchaser has secured funding of the Purchase Price, and is prepared to close on February 1, 2023, contrary to Mr. Ukahanow's [sic] statements; then I look forward to receiving your confirmation that Purchaser will close under the current terms of the APA, which confirmation I must receive in writing no later than **5 p.m. EST on January 13, 2023.**

(*Id.*).

Chapman did not respond immediately to Ms. Hopkin. On January 16, 2023, the Board met to discuss the January 11 Email. The Board decided to reject the requested price reduction and authorized Ms. Hopkin to make a counteroffer. (ECF No. 3-59, at 64–65). Ms. Hopkin sent a letter to Chapman the next day, January 17, 2023, repeating her characterization of the January 11 Email as an admission that Chapman could not secure funding and thus could not close on February 1. (ECF No. 11-1, at 87). The Second Hopkin Letter also addressed Chapman's failure to respond:

> In my letter dated January 11, 2023, I required you to confirm in writing no later than January 13, 2023 at 5 p.m. that Purchaser

---

[4] The term "Seller" in the First Hopkin Letter and following communications refers to Appellants. (*See* ECF No. 3-56, at 117).

> has the ability to fund the entire Purchase Price; and to close on February 1, 2023, pursuant to the terms set forth in the APA.
>
> Having received no such confirmation from you, together with Purchaser's actions, statements in writing, and failure to timely take requisite actions to ensure closing under the terms of the APA, Seller sends this notice of default of Purchaser's obligations under the APA due to Purchaser's definite, specific, positive, and unconditional repudiation of Purchaser's obligations in under the APA.

(*Id.* at 87–88). As approved by the Board, the letter included an offer to amend the APA and extend closing to March 1, 2023, subject to an additional deposit and other conditions. (*Id.* at 88–92).

Michael Maloney, counsel for Chapman, responded the next day, January 18, 2023, expressing that Chapman was "shocked and disappointed" by the First and Second Hopkin Letters and representing that:

> Seller's notice of default to Purchaser is completely without merit. The [Second Hopkin Letter] relies on an email from Purchaser dated January 11, 2023 as the only support for Seller's assertion that Purchaser will not be able to meet its funding obligations at Closing. However, Purchaser never stated any inability to perform such Closing obligations nor has it stated its inability to fund the acquisition. Rather, the email merely refers to market conditions, etc. to explain Purchaser's business need for the request for a purchase price reduction. Seller's convoluted understanding of a communication from Purchaser does not obligate the Purchaser to respond to Seller's frivolous Notice Letter. Purchaser, therefore, explicitly

> rejects and repudiates Seller's claim of either breach or default.

(ECF No. 3-56, at 117 ("Maloney Letter")). The Maloney Letter accused Appellants of being themselves in breach of APA provisions not relevant here but stated that Chapman "remains willing to work through these issues and negotiate in good faith to ensure the transaction closes." (*Id.* at 118).

The parties were unable to resolve their differences. On January 24, 2023, Appellants informed Chapman that they were terminating the APA. (ECF No. 3-18). Negotiations continued for several more weeks. (*See* ECF No. 3-23). On March 1, 2023, Appellants filed a breach of contract claim against Chapman in the Circuit Court for Charles County, Maryland. (ECF No. 3-58 ¶ 11).

**B. Procedural History**

The matter has since taken a long procedural route to reach this bankruptcy appeal. In brief, Chapman removed the Circuit Court case to this court on March 2, 2023. *Family of Care Real Estate Holding Co. v. Chapman Property LLC*, Case No. 23-cv-574-DKC (D.Md. Mar. 2, 2023) ("District Court Case"). Chapman filed counterclaims for breach of contract against Appellants on March 21, 2023. (District Court Case, ECF No. 22). The court denied summary judgment as to both parties' breach of contract claims on June 25, 2024. (District Court Case, ECF No. 154). Before the District Court Case could proceed further, Appellants filed

bankruptcy proceedings on October 18, 2024, (ECF No. 3-58 ¶ 15), and the District Court Case was administratively closed on October 22, 2024. (District Court Case, ECF No. 162).

On January 21, 2025, the Bankruptcy Court issued orders authorizing Appellants to reject the APA and sell SNF to a third-party buyer. (ECF No. 3-33; ECF No. 3-58 ¶ 16); *see also* 11 U.S.C. § 365(g) (permitting the trustee of a bankruptcy estate to reject any "executory contract" of the debtor).[5] "The rejection of an executory contract constitutes a breach of the contract." *In re Stewart Foods, Inc.*, 64 F.3d 141, 144 (4th Cir. 1995). As a result of the rejection of the APA, Chapman lost "the right to seek specific performance of the APA to the extent that it had any such right" at the time Appellants filed for bankruptcy. (ECF No. 3-58 ¶ 18). Chapman retained the right to seek monetary damages for the breach by filing a proof of claim. *See In re Fieldstone Mortg. Co.*, 427 B.R. 364, 374, 377 (Bankr.D.Md. 2010)

Chapman exercised that right on February 21, 2025, filing a proof of claim against Appellants of $7,070,677.30 in damages

[5] An executory contract is one where the "obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *In re Sunterra Corp.*, 361 F.3d 257, 264 (4th Cir. 2004) (quoting *Gloria Mfg. Corp. v. Int'l Ladies Garment Workers Union*, 734 F.2d 1020, 1022 (4th Cir. 1984)).

arising from the rejection of the APA. (ECF No. 3-53). Appellants objected to the claim, arguing that the APA was not an executory contract at the time they filed their bankruptcy petition because Chapman first (1) anticipatorily repudiated the APA; (2) failed to give adequate assurances that it would close on February 1, 2023; and (3) breached the implied covenant of good faith and fair dealing. (*See* ECF No. 3-67, at 2–16). Appellants also argued that Chapman failed to carry its burden to establish (1) that Appellants materially breached the APA; and (2) that Chapman fulfilled its duty to exercise good faith and fair dealing. (*Id.* at 16-22). The Bankruptcy Court "held a multi-day hearing beginning on October 22, 2025, and concluding on November 6, 2025, on the merits of the Claim Objection." (ECF No. 1-1, at 11). The parties presented evidence in the form of testimony, depositions, and exhibits, and provided written closing arguments.

On May 6, 2026, the Bankruptcy Court issued the order overruling Appellants' claim objection ("Order"). The court found that Chapman's actions did not constitute repudiation, failure to provide adequate assurance, or breach of the implied duty of good faith and fair dealing, and therefore the APA was executory at the time the bankruptcy petition was filed. (ECF No. 1-1, at 20). The Bankruptcy Court did not reference separately Appellants' contention that Chapman failed to establish that it fulfilled the

duty of good faith and fair dealing, but that argument is addressed by the holding that Chapman did not breach the duty. (*Id.* at 19–20). The court treated the rejection of the APA as a breach of the contract. (*Id.* at 12). Accordingly, the court held that "Chapman is entitled to rejection damages" arising from Appellants' rejection of the APA. (*Id.* at 20). The court reserved the calculation of damages for a later proceeding. (*Id.* at 11, 20).

On May 22, 2026, Appellants filed a notice of appeal to this court. (ECF No. 1). Appellants filed a brief on July 27, 2026, presenting only three issues on appeal: whether the bankruptcy court erred by (1) assigning Appellants the ultimate burden of proof as to Chapman's claim; (2) concluding that Chapman did not repudiate the APA; and (3) concluding that Chapman did not fail to provide adequate assurance of performance. (ECF No. 11, at 4–5). Chapman filed a response on August 31, 2026, (ECF No. 14) and Appellants filed a reply on September 18, 2026, (ECF No. 19).

Chapman attached to its response an appendix of additional exhibits not included in the initial designation of the record on appeal. (ECF No. 14-1).[6] One exhibit, R-42, was filed under seal.

---

[6] Chapman's appendix contains exhibits that are not relevant to this appeal or that are duplicative of evidence in the record. Chapman's appendix, therefore, need not be considered as part of the record on appeal. As the appendix appears on the public docket, however, it is appropriate to address Chapman's confidentiality concern raised in the motion to seal.

Chapman filed a motion to seal exhibit R-42 on August 31, 2026. (ECF No. 16). Neither Appellants nor another interested party have filed an objection to the motion to seal.

**II. Jurisdiction**

A district court has jurisdiction to hear appeals "from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1). A district court may also grant leave to file appeals from "other interlocutory orders and decrees" of bankruptcy judges. *Id.* § 158(a)(3). Appellants assert that the Order is final under § 158(a)(1), but in the alternative request that their notice of appeal be construed as a motion for leave to appeal the Order as an interlocutory order under § 158(a)(3). (ECF No. 11, at 7–8). In its response brief, Chapman does not address Appellants' request for leave to appeal.

Final orders under § 158(a)(1) must "'finally dispose of discrete disputes within the larger [bankruptcy] case.'" *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 39 (2020) (quoting *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015)) (alteration in original). The difficulty lies in determining "the proper scope of the proceeding, or 'discrete dispute,' adjudicated below." *Kiviti v. Bhatt*, 80 F.4th 520, 529 (4th Cir. 2023). This step in

the analysis “is perhaps the hardest, if only because it is the most novel.” *Id.*

It is not necessary to decide whether the Order, which adjudicated the merits of Chapman’s claim but left damages to be determined later, ended a discrete dispute. *But see First Owners’ Ass’n of Forty Six Hundred v. Gordon Props., LLC*, 470 B.R. 364, 370 (E.D.Va. 2012) (“In this matter, because both compensatory and punitive damages and the amount of the final sanction remain to be determined, there has been no final resolution of a discrete dispute.”); 1 Collier on Bankruptcy ¶ 5.08[1][b] (16th ed. 2026) (a final order “must completely resolve all of the issues pertaining to a discrete claim, including issues as to proper relief.” (quoting *In re Integrated Res.*, 3 F.3d 49, 53 (2d Cir. 1993)). Assuming that the Order is interlocutory, the court will grant Appellants’ request for leave to appeal. Chapman does not oppose granting leave, and it is in the interest of judicial economy to decide the appeal now.

**III. Standard of Review**

> In an appeal from Bankruptcy Court, this Court reviews factual findings for clear error and conclusions of law *de novo*. *Gold v. First Tenn. Bank Nat’l Ass’n (In re Taneja)*, 743 F.3d 423, 429 (4th Cir. 2014). A finding is clearly erroneous only if, after reviewing the record, the reviewing court is left with “a firm and definite conviction that a mistake

> has been committed." *Klein v. PepsiCo, Inc.*, 845 F.2d 76, 79 (4th Cir. 1988).

*Ekweani v. Thomas*, 574 B.R. 561, 567 (D.Md. 2017).

Under clear error review, a decision of the trier of fact may not be reversed so long as it is "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

When reviewing a mixed question of fact and law,

> a reviewing court should try to break such a question into its separate factual and legal parts, reviewing each according to the appropriate legal standard. But when a question can be reduced no further, we have added that "the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work." *U.S. Bank N.A. v. Village at Lakeridge, LLC*, [583 U. S. 387, 398] (2018).

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021). A mixed question that entails primarily legal work is reviewed *de novo*. *Bufkin v. Collins*, 604 U.S. 369, 382 (2025). However, some

> mixed questions require courts to resolve "case-specific factual issues." [*U.S. Bank N.A.*, 583 U.S. at 396 (2018)]. When the tribunal below is "immerse[d]" in facts and compelled to "marshal and weigh evidence" and "make credibility judgments," the appellate

> court "should usually review a decision with deference." *Ibid.*

*Bufkin*, 604 U.S. at 382.[7]

## IV. Analysis

### A. Burden of Proof

> The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim. The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim. 11 U.S.C. § 502(a); Fed.R.Bankr.P. 3001(f). The burden then shifts to the debtor to object to the claim. 11 U.S.C. § 502(b); [*Canal Corp. v. Finnman,* 960 F.2d 396, 404 (4th Cir. 1992)]. The debtor must introduce evidence to rebut the claim's presumptive validity. Fed.R.Bankr.P. 9017; Fed.R.Evid. 301; [4 Collier on Bankruptcy ¶ 501.02[3][d] (15th ed. rev. 2004)]. If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence. *Id.* at ¶ 502.02[3][f].

*In re Harford Sands, Inc.*, 372 F.3d 637, 640 (4th Cir. 2004). At step two of the burden-shifting framework, the debtor must produce evidence which, "if uncontravened, would be sufficient to defeat the legal basis for the claim asserted." *In re Gates*, 214 B.R. 467, 472 (Bankr.D.Md. 1997).

---

[7] Appellants cite contradictory cases from the United States Court of Appeals for the Fourth Circuit holding that mixed questions of law and fact are reviewed *de novo*. *In re J.A. Jones, Inc.*, 492 F.3d 242, 249 (4th Cir. 2007); *In re Litton*, 330 F.3d. 636, 642 (4th Cir. 2003). However, the more recent *Google* and *Bufkin* decisions control here.

Appellants assert that the Bankruptcy Court failed to apply the *Harford* burden-shifting framework and improperly placed on them the "ultimate burden of proof."[8] (ECF No. 11, at 24). However, "when a trial court applies the wrong legal test or quantum of proof, an appellate court may resolve the case without remanding if the evidence would inevitably produce the same outcome under the correct standard." *Humphrey v. Humphrey*, 434 F.3d 243, 248 (4th Cir. 2006). In a matter to be proved by the preponderance of the evidence, the allocation of the burden of persuasion "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 127 (2021); *see also Medina v. California*, 505 U.S. 437, 449 (1992). Otherwise, the allocation of burden is not determinative because the trial court's "task is simply to assess all the evidence" and determine whether an

[8] "[I]n American law, the term 'burden of proof' is understood to encompass two distinct burdens: the burden of persuasion and the burden of production. *See, e.g.*, *Schaffer v. Weast*, 546 U.S. 49, 56[] (2005)." *TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195, 210 n.18 (D.Md. 2011). The burden of persuasion determines "which party loses if the evidence is closely balanced" and the burden of production determines "which party bears the obligation to come forward with the evidence at different points in the proceeding." *Schaffer*, 546 U.S. at 56. *Harford* places the burden of production on the debtor at step two of the burden-shifting framework, with the ultimate burden of persuasion remaining on the claimant. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 174 (3d Cir. 1992). Thus, it is more precise to describe the 'ultimate burden of proof' that Appellants challenge as the burden of persuasion.

assertion is more likely than not. *Goldman Sachs*, 594 U.S. at 126–27.

The Bankruptcy Court did not explicitly apply the *Harford* burden-shifting framework, but correctly held that Chapman had established a prima facie claim for breach of contract (step one), and that the burden thus shifted to Appellants to produce evidence sufficient to raise an objection (step two). (ECF No. 1-1, at 12). As relevant to this appeal, Appellants objected that Chapman repudiated the APA and failed to provide adequate assurances. Assuming that Appellants carried their burden of production at step two, then Chapman bore the ultimate burden of persuasion as to those objections at step three. *See In re Gates*, 214 B.R. at 472–73; *In re USGen New England, Inc.* 429 B.R. 437, 473 (Bankr.D.Md. 2010), *aff'd sub nom. TransCanada Pipelines Ltd.*, 458 B.R. 195.

Appellants are correct that parts of the Order appear to place the ultimate burden of persuasion on Appellants. (*See* ECF No. 1-1 at 13–14; 19). There is no need to remand, however, because the court's ruling did not depend on the allocation of the burden of persuasion. The Bankruptcy Court found that the facts definitively weighed in Chapman's favor as to both repudiation and adequate assurance. As to repudiation, the court held that "Chapman never made a 'positive statement or act' repudiating the APA." (ECF No.

1-1, at 15). Therefore, the court held that "Chapman did not repudiate the APA." (*Id.* at 16). As to the second objection, the court made another unqualified finding that "Chapman provided reasonable adequate assurance." (ECF No. 1-1, at 17). Accordingly, had the court articulated that, at step three of the *Harford* burden-shifting framework, the burden of persuasion was placed on Chapman, the "evidence would inevitably produce the same outcome." *Humphrey*, 434 F.2d at 248.

**B. Anticipatory Repudiation**

Under Maryland law, a party may treat a contract as abandoned when the other party engages in anticipatory repudiation of the contract. *Weiss v. Sheet Metal Fabricators, Inc.*, 206 Md. 195, 203–04 (1955). "Ordinarily, in order to constitute anticipatory repudiation, there must be a definite, specific, positive, and unconditional repudiation of the contract by one of the parties to the contract." *W.M. Blomquist & Co. v. Cap. Area Realty Invs.*, 270 Md. 486, 494 (1973). In other words, "there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Harrell v. Sea Colony, Inc.*, 35 Md.App. 300, 306 (1977) (quoting 4 Corbin on Contracts Section 973 (1951).

In *Harrell*, the then named Court of Special Appeals of Maryland held that "[a] mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation." *Id.* (quoting 4 Corbin on Contracts Section 973). Therefore, a party under contract to buy a condominium did not repudiate the contract despite informing the seller that he "'wanted to cancel the contract' and 'did not want to proceed with settlement' because his 'personal financial situation . . . was such that he felt he could not proceed with the purchase of this unit.'" *Id.* at 307.

The Bankruptcy Court assessed whether "Chapman's statements and/or actions were objectively a definite repudiation."[9] (ECF No. 1-1, at 13–14). The court concluded that "considering the surrounding circumstances, neither the January 11 Email nor any other actions or statements attributable to Chapman provide the requisite, definitive repudiation" of the APA. (*Id.*). This

---

[9] The Bankruptcy Court also concluded that anticipatory repudiation involves a "subjective element" that required Appellants to "show that they understood the statements and/or actions of Chapman as a definite repudiation." (ECF No. 1-1, at 13). The parties below and the court presumably relied on *Blomquist* for this proposition. This may be an overreading of the section discussing Corbin on Contracts: "A statement of inability to perform . . . may be so made as to justify the other party in understanding it as a definite repudiation." 270 Md. at 495. However, the court's finding that Appellants "did not interpret the January 11 Email as a definitive repudiation" provides further support for the conclusion that objectively the email did not definitively repudiate the APA. (ECF No. 1-1, at 15).

finding will be reviewed for clear error because it is primarily a question of fact.

The court analyzed the words of the January 11 Email, concluding that the email did not "definitively and unequivocally manifest an intention" to repudiate the APA. (ECF 1-1, at 15). The court found that the language of the January 11 Email spoke "merely of prudential constraints" and did not "state that Chapman [did] not have the funds to close or that there were definitive, insurmountable hurdles to closing." (*Id.*).

This conclusion is not clearly erroneous. The language of the January 11 Email is far from "definitive, specific, positive, and unconditional." *Blomquist*, 270 Md. at 494. The strongest language in the email is the claim that Chapman "would need a $1.5MM adjustment in the purchase price to move forward and cushion some of the impact." (ECF No. 11-1, at 84). However, this language is immediately qualified as subject to Appellants' approval: "If this is acceptable . . . ." (*Id.*). The message ends with the statement "we appreciate the consideration and look forward to hearing back," further demonstrating that Chapman was not making an unequivocal or unconditional repudiation. (*Id.*). The January 11 Email thus can be read plausibly as a "mere request for a change in terms" of the APA. *Harrell*, 35 Md.App. at 306. Therefore, the

Bankruptcy Court's view of the evidence is permissible and cannot be clear error. *See Anderson*, 470 U.S. at 574.

Appellants argue that the January 11 Email contained "a clear statement that [Appellants'] only option to proceed to closing was to accept less than the APA required." (ECF No. 11, at 31). They compare the email to the facts of a recent Maryland case, *St. Charles Towne Plaza, LLC v. Sanahed, Inc.*, in which landlords told a tenant it had only two options: vacate the property a year before the conclusion of its lease, or sign a new five-year lease agreement. No. 1153, Sept. Term, 2023, 2025 WL 814810, at *9 (Md. App. Ct. Mar. 14, 2025). The court in *St. Charles* concluded that the landlords' statement was an anticipatory breach because it was a clear demonstration that they would not comply with the term set out in the lease agreement. *Id.*

Even without giving due deference to the findings of the Bankruptcy Court, Appellants' argument is at odds with the text of the January 11 Email. The language that Chapman "would need" a price reduction falls short of a clear refusal to comply with the APA. Nor did Chapman suggest that its performance was conditioned on receiving a price reduction. Accordingly, the January 11 Email is closer to the request for changed terms in *Harrell*, in which the buyer expressed that his finances were such "that he felt he could not proceed," than the ultimatum given in *St. Charles*.

The Bankruptcy Court bolstered its interpretation of the January 11 Email by considering the "surrounding circumstances" of negotiations between Appellants and Chapman. (ECF No. 1-1, at 14). The court noted that Mr. Kahanow and Ms. Dwyer were "sophisticated" businesspeople and negotiators, and that the January 11 Email was part of an ongoing conversation between the two. (*Id.*). The court also gave weight to the fact that Mr. Kahanow sent the email "[a]t Ms. Dwyer's insistence" so that she could present Chapman's request to the Board. (*Id.* at 14). Thus, the Bankruptcy Court concluded that "[t]he January 11 Email was, objectively, a transparent negotiating tactic" as opposed to a definitive repudiation. (*Id.* at 16).

Although Appellants dispute this interpretation of the email, (ECF No. 11, at 31), "merely disagree[ing] with [a judge's] characterizations of the facts" does not amount to clear error. *Klein*, 845 F.2d at 79. The Bankruptcy Court's characterization is plausible in light of negotiations between Mr. Kahanow and Ms. Dwyer leading up to the January 11 Email. Accordingly, it was not clear error to find that the email was a transparent negotiation tactic, and this finding supports the conclusion that the January 11 Email was not an anticipatory repudiation.

Appellants also argue that Chapman's lack of funds to close, in combination with other signs of unpreparedness to take over

operations of the SNF, constituted a breach of the APA by manifesting an "existing appearance of inability" to perform under the APA. (ECF No. 11, at 33). Appellants assert that "Chapman was not prepared, or even trying to prepare, to close on February 1, much less pay the $28,200,000 contract price." (ECF No. 11, at 34). The other signs of unpreparedness included that Chapman "had no employment contract with [Appellants'] medical director, whom Chapman indicated it would ask to continue serving after the sale," and that "[n]o appraiser had visited the [SNF], as needed for Popular Bank's loan underwriting process, nor had any title agent contacted Appellants to complete the significant paperwork needed for closing." (*Id.* at 35–36). Appellants concede that "the APA did not require these items." (*Id.*).

Appellants' argument rests on a legal misunderstanding. Appellants cite *Blomquist* for the rule that

> [t]here may be cases in which expressions of inability by one party or an existing appearance of inability on his part to perform will justify the other party in nonperformance of his part of the contract or in materially changing his position so as to make performance impossible, without at the same time operating as an anticipatory breach, for

> which an action for damages could be maintained.

270 Md. at 494 (quoting 4 Corbin on Contracts Section 974 (1951)).[10] However, *Blomquist* related this rule to Section 323 of the Restatement of Contracts, titled "Effect of Apparent Inability or of Expressions of Doubt Followed by Change of Position, which states:

> (1) Where a party to a contract materially changes his position in reasonable reliance on the other party's
>
> (a) manifestations of unjustified lack either of intention or of ability, or
>
> (b) apparent inability without justification
>
> to perform a condition or a promise for an agreed exchange, a subsequent tender of correct performance by the latter party is inoperative to prevent the occurrence of a breach of contract by him at the time when performance becomes due.

Restatement of Contracts, Section 323 (A.L.I. 1932). Section 323 is specific to instances where a suggestion of inability to perform prompts the other party materially to change position, such as entering a substitute contract with a third party. *See id.* illus. 3.

[10] An updated version of this section appears as Section 59.16 in the revised edition. 10 Corbin on Contracts Section 59.16 (Rev. ed. 2026).

The comments to Section 323 explain that an apparent inability to perform does not necessarily amount to a breach or anticipatory repudiation. *Id.* cmts. a, b. So too does the quoted language from *Blomquist*, which states that an expression or appearance of inability to perform may justify nonperformance or a change in position "without at the same time operating as an anticipatory breach." 270 Md. at 494. This language from *Blomquist* thus does not support the Appellants' position that Chapman's apparent inability to close on February 1, 2023, constituted an anticipatory breach.

Moreover, Appellants' argument runs contrary to *String v. Steven Dev. Corp*, 269 Md. 569 (1973). *String* involved a contract to build a home. After several months of inactivity at the building site, the buyer concluded that it would be impossible for the builder to complete construction by the anticipated date and informed the builder that the contract was "breached and null and void." *Id.* at 571–72. The builder responded that it hoped to complete construction in time but received no reply. Litigation followed, in which the buyer claimed the builder's delay constituted an anticipatory breach. *Id.* at 574.

The then named Court of Appeals of Maryland held that there is a distinction "between a mere failure to prepare for performance and a specific anticipatory repudiation." *Id.* at 579. The court

explained that "failure to take preparatory action before the time when any performance is promised is not an anticipatory breach, even though such failure makes it impossible that performance shall take place, and though the promisor at the time of the failure intends not to perform his promise." *Id.* (quoting Restatement of Contracts Section 318, cmt. i (A.L.I. 1932)); *see also Stefanowicz Corp. v. Harris*, 36 Md.App. 136, 146 (1977). Accordingly, Chapman's purported failure to secure funds and undertake other preparations prior to closing did not amount to an anticipatory breach under Maryland law.

Appellants raise two further arguments, which fail as a matter of law. First, Appellants contend that the January 11 Email functioned as a counter-offer and quote the general principle that "a counter-offer is a rejection, not an acceptance." (ECF No. 11, at 29) (quoting *Grp. Home on Gibson Island, LLC v. Gibson Island Corp.*, 144 F.4th 522, 534 n.7 (4th Cir. 2025)). However, this rule applies to the rejection of offers, not repudiation of an existing contract. *See Ebline v. Campbell*, 209 Md. 584, 591, *modified*, 209 Md. 584 (1956).

Second, Appellants argue that the Bankruptcy Court should have applied a different set of rules to the APA because of the nature of the work performed at the SNF:

> [Appellants] were responsible for 100 patients who required around-the-clock skilled nursing

> care. Had [Appellants] not terminated on January 24, and Chapman been unable to close on February 1, [Appellants] would have had to reverse the cancellation of all operating contracts to ensure continuity of care in a highly regulated environment—including pharmaceutical supplies, ambulance transportation, food, employee contracts and health care, medical supplies, utilities, and a plethora of licensing for commercial kitchen, pharmaceutical and other highly regulated services.

(ECF No. 11, at 36–37). Appellants do not cite any Maryland law for the proposition that skilled nursing facilities require a different legal standard and simply speculate that the Supreme Court of Maryland would rule in their favor. (*Id.* at 37–39). Because it has no grounding in Maryland law, this argument lacks merit. Moreover, Appellants could have contracted to include safeguards in the APA to avoid these risks. Appellants' failure to account for their own circumstances when entering the APA does not justify a change in governing law.

**C. Adequate Assurance**

The Restatement (Second) of Contracts, Section 251, provides that:

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by nonperformance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

> (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

(A.L.I. 1981). Appellants contend that this is part of Maryland law, that they properly sought reasonable assurance, and that the bankruptcy court erred in finding that Chapman had provided reasonable assurance.

Maryland courts have not adopted Section 251. (*See* ECF No. 1-1, at 17); *Rock Spring Plaza, II, LLC v. Invs. Warranty of Am., LLC*, No. 25-1736, 2026 WL 1679031, at *14 (4th Cir. June 10, 2026) (per curiam) (unpublished). In this situation, this court must "predict" how the state's highest court would rule. *Near v. Enerco Grp., Inc.*, 182 F.4th 341, 353 (4th Cir. 2026). But, as noted in *Rosser By & Through Brown v. Wal-Mart Stores, Inc.*, 947 F.Supp. 903, 906 (E.D.N.C. 1996), "[a] federal court sitting in diversity must apply the law of the state as it exists, and cannot participate in an attempt to change or expand state substantive law. *Burris Chem. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993)." In other words,

> The court must therefore tread a difficult path between, on the one hand, interpolating the development of state law and applying that law as would the North Carolina Supreme Court, and on the other hand, avoiding application of

> state law in such a manner as to change North Carolina law.

*Id.*

As the Appellate Court of Maryland recently explained, the Restatement

> is not binding upon this Court or any other in Maryland. The Restatement (Second) of Contracts—and every other Restatement—is merely a secondary source providing a survey of trends in common law on a national scale. *See* Black’s Law Dictionary (11th ed. 2019) (defining a Restatement as “[o]ne of several influential treatises published by the American Law Institute describing the law in a given area and guiding its development”). As Black’s Law Dictionary states, “Although the Restatements are frequently cited in cases and commentary, a Restatement provision is not binding on a court unless it has been officially adopted as the law by that jurisdiction’s highest court.” *Id.*

*In re Featherfall Restoration LLC*, 261 Md.App. 105, 137 (2024) (alterations in original), *rev’d on other grounds sub nom*. *Matter of Featherfall Restoration, LLC*, 491 Md. 586 (2025). Therefore, failure to provide adequate assurance is not a viable objection to Chapman’s claim under Maryland law.[11]

---

[11] The Bankruptcy Court noted that a federal court applied the concept of adequate assurance in a dispute over the assignment of a lease agreement under Maryland law. *Rock Spring Plaza, LLC v. Invs. Warranty of Am., LLC*, No. 20-cv-01502-JRR, 2025 WL 1504850, at *17 (D.Md. May 27, 2025), *aff’d sub nom.* 2026 WL 1679031. However, that case dealt primarily with Section 317 of the Restatement (Second), which the court interpreted to allow a party to seek “appropriate information” as to whether its interests are at risk when a contract is assigned to a third party. *Id.* at *3,

The Bankruptcy Court declined to decide whether Section 251 applied to the APA, reasoning that even if Section 251 applied, "Chapman provided reasonable adequate assurance." (ECF No. 1-1, at 17). Assuming that Section 251 does apply, the Bankruptcy Court did not err in this conclusion.

Whether an assurance is adequate "depends on what it is reasonable to require in a particular case taking account of the circumstances of that case." Restatement (Second) of Contracts, Section 251 cmt. e. Thus, the conclusion that Chapman provided adequate assurance is a fact-specific determination that will be reviewed for clear error. *See In re Lonestar Indus., Inc., Concrete R.R. Cross Ties Litig.*, 776 F. Supp. 206, 228 (D.Md. 1991) (whether assurances are adequate is a question of fact under the parallel provision of the Uniform Commercial Code ("U.C.C.")).

The Bankruptcy Court found that, if Section 251 applied, the January 11 Email was "an expression of doubt" that gave Appellants "reasonable grounds to believe that Chapman would not or could not close by the time and at the price required under the APA." (ECF No. 1-1, at 16, 17). Accordingly, it was appropriate for

*15; *see also Rock Springs Plaza II, LLC v. Invs. Warranty of Am., LLC*, 618 F.Supp.3d. 262, 270–73 (D.Md. 2022). Reference to Section 251 was brief. *See Rock Springs Plaza*, 2025 WL 1504850 at *17. On appeal, the Fourth Circuit did not hold that Section 251 applies under Maryland law. *Rock Spring Plaza, II*, 2026 WL 1679031 at *13–14.

Appellants to demand adequate assurance that Chapman would perform. Appellants did so in the First Hopkin Letter sent on January 11, 2023, requesting confirmation that Chapman "will close under the current terms of the APA." (ECF No. 3-56, at 112).

The Bankruptcy Court next concluded that the First Hopkin Letter was not "a reasonable demand for adequate assurance" because Appellants demanded that Chapman respond within two days. (ECF No. 1-1, at 17–18). It is not clear, however, that Section 251 requires that the *demand* be reasonable. It appears sufficient, at least under the parallel provision of the U.C.C., that the demand provides a "clear understanding" that the demanding party intends to suspend its performance or terminate the contract unless it receives adequate assurances. *Rocheux Intern. of N.J., Inc. v. U.S. Merchants Fin. Grp., Inc.*, 741 F.Supp.2d 651, 673(D.N.J. 2010) (collecting cases). The demand, however, cannot define what constitutes reasonable assurance. The Bankruptcy Court independently held that Chapman provided adequate assurance. (ECF No. 1-1, at 18). That finding is not clearly erroneous.

The Bankruptcy Court held that the Maloney Letter "explicitly rejected [Appellants'] interpretation of the January 11 Email" and "affirmed that it 'never stated any inability to perform . . .[or] fund the acquisition." (ECF No. 1-1, at 18). Furthermore, the Maloney Letter stated that Chapman "remains willing to work through

these issues and negotiate in good faith to ensure the transaction closes." (*Id.*). Although the letter was "drafted in lawyer-speak," the Bankruptcy Court attributed this to the fact that "both parties were anticipating litigation." (*Id.*). Taking all these factors together, the Bankruptcy Court concluded that the letter was an adequate "assurance of due performance." (*Id.*).

The assurance that Chapman "never stated any inability to perform" or "to fund the acquisition," despite being worded awkwardly in the negative, was responsive to Appellants' concern that Chapman could not secure funding for the purchase price and would not close on February 1. Moreover, the Maloney Letter explained that the January 11 Email "merely refer[red] to market conditions, etc. to explain Purchaser's business need for the request for a purchase price reduction." (ECF No. 3-56, at 117). This statement provided a valid explanation for Chapman's conduct that refuted the implication that Chapman would fail to procure funding or close on time. Thus, based on the language of the Maloney Letter, the Bankruptcy Court could reasonably conclude that Chapman provided adequate assurance.

**D. Motion to Seal**

"[T]he public and the press have a qualified right of access to judicial documents and records." *Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014). Public access to court documents

"serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." *Id.* (quoting *Littlejohn v. Bic Corp.*, 851 F.2d 673, 682 (3d Cir. 1988).

In recognition of the public's right to access, when sealing court documents the district court

> must (1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives. *See* [*In re Knight Publ'g Co.*, 743 F.2d 231, 235–36 (4th Cir. 1984)]; *see also* [*Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 181 (4th Cir. 1988)]. These procedures "must be followed when a district court seals judicial records or documents." *Stone,* 855 F.2d at 179–80, 182.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000). Likewise, when filing a motion to seal in this district a party must provide "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." Local Rule 105.11. The court will not rule on the motion for at least fourteen days to allow "the filing of objections by interested parties." *Id.*

Chapman seeks to seal Exhibit R-42 (“R-42”) of its appendix, (ECF No. 14-1, at 69), but makes only a cursory attempt to meet the requirements of Local Rule 105.11. R-42 contains the minutes of the Board meeting held on January 16, 2023, in which the Board considered the January 11 Email and directed Ms. Hopkin to reject Chapman’s proposed price reduction and make a counteroffer to amend the APA. (*See* ECF No. 1-1, at 8 (describing the Board meeting in general terms)). Chapman’s only provided reason for sealing R-42 is that it falls “under the terms of the Confidentiality and Protective Order previously entered” in the earlier District Court Case. (ECF No. 16-2, at 2). That order allowed the parties to designate certain documents disclosed during discovery as confidential and barred the disclosure of such documents to third parties. (*See* District Court Case, ECF No. 66-1 at 3–6). However, the court order explicitly noted that:

> whenever materials subject to the confidentiality order (or any paper referring to them) are proposed to be filed in the court record under seal, the party making such filing must simultaneously submit a motion and accompanying order which includes (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection (see Local Rule 105.11).

(District Court Case, ECF No. 69). Accordingly, the confidentiality order does not provide an independent basis for sealing an exhibit.

Despite the insufficiency of Chapman's motion, it is appropriate to seal R-42 because all the relevant information it contains has been publicly disclosed in the appellate record. The pertinent details of the January 16 Board meeting are described in the Order, which is not sealed. (ECF No. 1-1, at 8). The record also contains significant portions of unsealed testimony describing the meeting and the contents of R-42. (ECF No. 3-59, at 64–70, 114–17; ECF No. 3-61, at 152–59, 178–83). Thus, to the extent that the contents of R-42 were considered in this appeal, the public has access to those contents, and the public interest in overseeing and understanding the judicial process is satisfied. Any remaining confidential information within R-42 can be rightfully protected without harm to the public.

The other requirements for sealing a document are satisfied. The public had notice and a reasonable amount of time to object—about six weeks since the filing of the motion to seal—and there are no sufficient alternatives to preserve whatever confidential information remains in R-42. Accordingly, R-42 will be filed under seal. Because this sealing is only appropriate because of the unusual circumstance that the exhibit is practically irrelevant,

Chapman is reminded to provide “proposed reasons supported by specific factual representations” in any future motion to seal. Local Rule 105.11.

**V. Conclusion**

For the foregoing reasons, the order of the Bankruptcy Court will be affirmed. A separate order will follow.

/s/

DEBORAH K. CHASANOW
United States District Judge